Filed 4/3/24  P. v. Dominguez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　v.<br><br>SANTIAGO MALDONADO DOMINGUEZ,<br><br>　　Defendant and Appellant. | D083073<br><br><br>(Super. Ct. No. FWV21004489) |


APPEAL from a judgment of the Superior Court of San Bernardino, Daniel W. Detienne, Judge.  Affirmed.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Santiago Maldonado Dominguez was arrested after Jane Doe, his stepdaughter's 13-year-old friend, accused him of massaging her breasts with

Vicks VapoRub and attempting to rub it near her "private areas" during a sleepover with her friend at his apartment.

A jury found Dominguez guilty of two counts of committing a lewd act on a child under the age of 14. (Pen. Code,[1] § 288, subd. (a); counts 1 and 2.)[2] The trial court sentenced Dominguez to a six-year term for count 1 and a concurrent six-year term for count 2.

Dominguez asserts three contentions of error on appeal. First, he contends the trial court erred in denying his motion to suppress the statements he made to a detective during a pre-arrest interview. Second, he argues the record lacks sufficient evidence of intent to support his convictions. Finally, he insists the trial court abused its discretion in denying probation.

We disagree and therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.

Prosecution

Doe met K., Dominguez's stepdaughter, when they both were in fifth grade, and they became close friends. Doe described K. as being "like my sister." About a year later, she met K.'s family and started regularly going over to K.'s home, which was in the same apartment complex. She said Dominguez was always there.

A few weeks after Doe met Dominguez, he started calling her two to three times per week on the telephone. The conversations were short, and he

[1]    Statutory references are to the Penal Code unless otherwise specified.

[2]    The prosecutor clarified that the charged counts were based on Doe's allegations. Specifically, one count was for touching both breasts and the other count was for touching Doe's stomach area.

2

would invite her to their apartment and say things like, "Your sister [referring to K.] misses you." He then sent her a friend request on Facebook and, after she accepted, started contacting her through Facebook. She said he would send messages and call via Facebook to invite her over to their home. He once wrote and invited her to a party. Although K. also had her own Facebook account and the girls did communicate directly, K. told Doe that she did not have Wi-Fi or internet access so Doe should also contact her through Dominguez.

In February 2020, when Doe was 13, she slept over at K.'s apartment. Doe was "really sick" that day and suffering from congestion, a runny nose, and a headache. However, she told the family she was okay to spend the night. K.'s mother was home when she arrived at about 3:00 p.m., but then she left for work before everyone went to bed. Doe's understanding was that the whole family slept in one room of the apartment, with K.'s younger brother sleeping on the top bunk, K. sleeping on the bottom bunk, and Dominguez and his wife (when she was home) sharing a small bed closer to the door.

Doe, K., K.'s brother, and Dominguez went to sleep in the same bedroom at about 8:30 p.m. Doe slept on the bottom bunk with K. and wore a big T-shirt and long pants with an elastic waistband. At about 10:00 p.m. she awoke and saw that K. and Dominguez were asleep. The television was on so she could see around the room.

About 10 minutes later, Dominguez woke up. He did not say anything to Doe but got up, retrieved a container of VapoRub, and started rubbing it between his hands. He then came over and put his hands under her shirt to rub it on her neck. From there, he moved his hand down under her bra to her breasts, slowly massaging one breast and nipple in a circular motion before

3

moving on to do the same on the other side. She had not asked him to apply VapoRub to her.

Next, Dominguez grabbed her arm and told her to come over to his bed. He guided her across the room and then used both hands to lay her down on the bed. After sitting next to her on the bed, he rubbed VapoRub over her arms and under the bottom of her shirt onto her stomach. He then moved down toward just above her hip bones above her "private area." When she felt like he was going to move onto her "vagina area" she said, "no." He stopped but told her not to tell anyone what had happened that night.

Doe went back to K.'s bed but did not sleep the rest of the night. She said she did not call her mother because she was confused, scared, and "wasn't sure if it was normal." In the morning, she told K. what had happened and then went home around 10:00 a.m. after K.'s mother returned. She did not tell her own mother what had happened because they had not been getting along and she was afraid her mother would not believe her.

After that night, Dominguez continued to call Doe frequently and contact her via Facebook to invite her over, telling her, "your sister wants to see you." In March 2020, Doe contacted him once to ask if they were home and then went to their house. She only went to Dominguez's house to see K. a few times after the incident, but said when she did, Dominguez tried to buy her candy and take the girls out to eat, which he had not done before the incident.

Almost a year after the sleepover, Doe's mother noticed she had been locked up in her room for a week crying, which was unusual for Doe. When Doe's mother asked her why she was crying, Doe told her what had happened. Her mother complained to Dominguez's wife and filed a statement with the police.

4

When Doe was interviewed by police, she told them she had a really bad memory, but she later clarified that she meant about dates, not events. At trial, she testified that Dominguez did not try to kiss her and did not say anything sexual.

Detective Amanda Riedell testified that she went to Dominguez's apartment after receiving the report regarding Doe in March 2020, but just left a business card because he was not home. They attempted to reach each other by telephone for several months and then, in late November 2021, finally spoke and arranged a meeting.

In early December 2021, Dominguez voluntarily went to the police station to speak with Detective Riedell. Detective Riedell took him to an interview room and her partner, Alma Hernandez, translated their discussion. Officer Hernandez was not involved in investigating the case and only participated by translating.

Detective Riedell said Dominguez was aware Doe had made allegations that he touched her inappropriately when she slept over. During the interview, Detective Riedell said Dominguez admitted he took it upon himself to apply VapoRub to Doe's neck area, even though she had not asked him to do so, to make her feel better. He stated that if he touched her breast, it was unintentional, but he was not sure if he had or not.

Initially, Dominguez told Detective Riedell that he had not contacted Doe via telephone or social media and was not friends with Doe on Facebook. But, after she showed him Facebook messages between the two, he acknowledged he may have communicated with Doe for his stepdaughter. He also admitted he had recently searched for Doe on social media and determined that she must have blocked him.

Finally, Detective Riedell said she asked Dominguez if he would feel comfortable if anyone put VapoRub on his stepdaughter. He said he would feel comfortable and that his first thought would not be that he thought the person was trying to assault his daughter. He also said he would feel comfortable if someone did it to his wife.

## II.

## Defense

A. *Dominguez's Wife*

The defense called Dominguez's wife to testify. She said Doe came over often and told them she and her mother were not getting along and they did not have food at home. She explained that she had told Doe to go home because she was sick, but that Doe wanted to stay because her mother did not pay attention to her. She said Doe asked her or her husband to put VapoRub on her and that she observed Dominguez applying it at around 8:00 p.m. According to the wife, he put it on Doe's throat, back, and feet, and then they gave her socks to wear. She said he did not touch her breasts or anywhere near her hips or private area.

The wife also stated that she did not work that night because she had lost her job and was there the whole time. Her recollection was that she stayed up until 1:00 a.m. or 2:00 a.m. watching television before going to sleep with Dominguez on an inflatable mattress in the living room. She acknowledged that when she first spoke with a detective, she told the detective Doe had never spent the night at her house because a social worker had threatened to take away her children. However, she later admitted Doe had spent the night.

At trial, she testified that it did not seem strange to her that Doe asked her husband to rub VapoRub on her and that they just felt bad for Doe. They

6

thought they were helping. She said she was also Facebook friends with Doe but had not communicated with her that way.

B. *Detective Riedell*

The defense recalled Detective Riedell to ask about the December 2, 2021 interview. She said she had informed Dominguez that they retrieved male DNA from Doe's chest but acknowledged that was not true.

C. *Dominguez*

Dominguez testified on his own behalf. He described Doe as having heavy phlegm that night and having such a runny nose that she was almost crying. He said K. had told Doe that Dominguez put VapoRub on her brother when he was sick, and he got better. Doe then asked him to apply VapoRub to her. He said he went to get the VapoRub from the bedroom and, although his wife was home, he could not recall if she was in the room when he applied it.

According to Dominguez, he only put VapoRub on Doe's throat, nose, forehead, back, stomach area (but only down to the belly button), and feet. He said he did not think about having his wife or stepdaughter put it on and thought it was okay to do because Doe requested it. He also explained that VapoRub was commonly used for symptoms of flu and colds in Mexico, where he grew up.

When asked about his statement during the interview with Detective Riedell where he said, "Um if there was a time maybe it was on her chest, but it—my intentions weren't bad, but it wasn't anything wrong, it was just on her chest," he explained that he was trying to say he was rubbing so she could get better. He explained, "I wasn't thinking that, that I was gonna touch her breast." He also said during the interview that he did not remember touching her nipples.

7

As to the Facebook messages and phone calls, he said they were always on behalf of his stepdaughter. He explained that Doe was like part of the family and had asked them to adopt her.

## DISCUSSION

## I.

## Denial of Dominguez's Motion to Suppress

Dominguez contends the trial court erred when it denied his motion in limine during the Evidence Code section 402 hearing. Specifically, he argues the court should have excluded the statements he made during the December 2021 interview with Detective Riedell. In his view, the interrogation was custodial and, thus, he should have been warned pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) prior to questioning.

### A. *Additional Facts*

On July 11, 2022, the trial court held a hearing pursuant to Evidence Code section 402 to address the admissibility of Dominguez's statements to law enforcement in December 2021. The trial court did not hear the recording of the interview at that time or review the transcript. Rather, the prosecution presented the live testimony of Detective Riedell.

Detective Riedell explained that when she and Officer Hernandez greeted Dominguez in the police station lobby, Officer Hernandez was in her patrol uniform. They escorted Dominguez to an interview room just behind the lobby. Detective Riedell said she asked Dominguez if he cared if she closed the door for privacy reasons and that he responded that he was okay with whatever she wanted to do. She then left it open a crack. She and Officer Hernandez sat next to each other on the side of the table closest to the door with Dominguez seated across from them. They both had their service weapons holstered.

8

Detective Riedell told Dominguez he was not under arrest and was free to leave at any time if he no longer wished to talk to her. He indicated he understood the admonishment and was willing to speak with her. She described the tone of the conversation as "very calm" and said neither officer ever raised her voice. The interview lasted about 45 minutes but, at one point, the officers left the room for about 10 minutes and shut the door. Detective Riedell said Dominguez never asked her to stop the interview or asked to leave, nor did he leave while they were out of the room.

During the questioning, she said she asked for his side of the story. She did not tell him he was a witness or a suspect. Instead, she told him that VapoRub opens the pores and that adult male DNA had been found on Doe's breast area, which was not true. She also asked if his wife was present that night. After Detective Riedell untruthfully told him his wife's pay stub reflected that she was at work during the incident, he said he was not sure if his wife was home. Finally, after Dominguez denied that he told Doe not to tell anyone, Detective Riedell asked why Doe would lie.

As previously noted, Dominguez eventually admitted he rubbed VapoRub on Doe. After taking him into custody at the conclusion of the interview and reading him his *Miranda* rights, Dominguez admitted to what he had already stated and said he was honest about everything he had previously told her.

No other evidence was offered by either side. After hearing argument from counsel, the trial court concluded that some custody factors indicated Dominguez was in custody for *Miranda* purposes. In particular, the interview was conducted at the police station with the door closed; there were two armed officers in a small interview room, one of whom was in uniform; the officers were closer to the door; the interview took 45 minutes; it was

9

"somewhat accusatory"; Detective Riedell used subterfuge; Dominguez was confronted with the Facebook message; he was asked why Doe would be lying; and he was arrested at the end of the interview.

On the other side, the court noted that the following factors weighed against finding he was in custody: he came to the police station on his own; the door was cracked open and the exit was not blocked; Dominguez agreed the door could be closed for privacy; the uniformed officer was only there to translate; the officers' weapons were holstered; there was a 10-minute break; the interview was calm and voices were not raised; the purpose of the interview was known; and the questions about whether he would be comfortable if someone did this to his family members were made after he had already admitted rubbing VapoRub on Doe.

Looking at the "big picture," the court concluded the interview was not custodial. The court highlighted that the officer's approach to the interview was very casual in that she left a business card and only interviewed him months later after he volunteered to come to the station. She also admonished him that he was not under arrest and was free to leave, and he cooperated and never asked to stop the interview or leave.

B. *Legal Principles and Standard of Review*

Under the Fifth Amendment, no person shall be compelled in any criminal case to be a witness against himself. In *Miranda*, the Supreme Court adopted "a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation." (*People v. Jackson* (2016) 1 Cal.5th 269, 339, internal citations omitted.) If a defendant makes statements while under custodial interrogation without being advised of his rights under *Miranda*, the statements cannot be used as evidence to establish

10

guilt. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 429.) An officer's obligation to administer *Miranda* warnings, however, attaches only when the person questioned is in "custody." (*Stansbury v. California* (1994) 511 U.S. 318, 322 (*per curiam*).) The relevant inquiry when considering whether an interrogation was custodial is whether, in light of the objective circumstances, a " 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Howes v. Fields* (2012) 565 U.S. 499, 509 (*Howes*).)

Relevant factors when determining whether someone is in custody include " 'whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.' " (*People v. Potter* (2021) 66 Cal.App.5th 528, 539–540.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.) We

11

review the trial court's factual findings on the circumstances of the interrogation for substantial evidence and decide independently whether under the totality of the circumstances a reasonable person in the defendant's position would have felt free to stop the questioning and leave. (*Ibid.*; *In re I.F.* (2018) 20 Cal.App.5th 735, 760.) Thus, "[a]n appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 730.)

C. *Analysis*

Although we do not defer to the trial court's legal analysis, we believe the trial court thoroughly considered the relevant factors in concluding the interview was noncustodial. Considering the totality of the circumstances, we agree with its ultimate conclusion.

We are guided in our analysis by United States Supreme Court decisions evaluating this question. The high court addressed similar facts in *Oregon v. Mathiason* (1977) 429 U.S. 492 (*per curiam*) (*Mathiason*). There, an officer investigating a burglary left his business card at the defendant's home. (*Id.* at p. 493.) The defendant called the officer and agreed to meet at the police station to talk. (*Ibid.*) The officer took the defendant into an office, closed the door, sat across from him, and told him he was not under arrest. (*Ibid.*) The officer then told him the police believed he was involved in the burglary and (falsely) told him his fingerprints were found at the scene. (*Ibid.*) After thinking for a moment, the defendant admitted taking the property. (*Ibid.*) Thereafter, the officer advised him of his *Miranda* rights, recorded a confession, and then released him within about 30 minutes of his

12

arrival. (*Id.* at pp. 493–494.) On these facts, the high court concluded "Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" (*Id.* at p. 495.)

The Court reached a similar result in *California v. Beheler* (1983) 463 U.S. 1121 (*Beheler*). In that case, Beheler and several acquaintances attempted to steal marijuana, but when the dealer refused to relinquish it, Beheler's companion killed her. (*Id.* at p. 1122.) Beheler called the police and told them what had happened. (*Ibid.*) Later, the police specifically told Beheler that he was not under arrest, and he voluntarily agreed to accompany them to the station. (*Ibid.*) There, he agreed to talk about the murder without being advised pursuant to *Miranda*, he was interviewed for less than 30 minutes, and officers then permitted him to return home. (*Ibid.*) The high court concluded it was "beyond doubt that Beheler was neither taken into custody nor significantly deprived of his freedom of action." (*Id.* at p. 1123.)

Under these precedents and subsequent cases interpreting them, we conclude Dominguez was not in custody for *Miranda* purposes. As in both *Mathiason* and *Beheler*, he voluntarily agreed to meet Detective Riedell at the police station and was expressly told he was not under arrest and was free to leave. Furthermore, he came despite knowing that Doe had made allegations against him. In other words, Detective Riedell did not surprise him with that information or mislead him as to the basis for the interview. Like in *Mathiason*, they met in a room within the station and sat across from one another, although here Detective Riedell gave Dominguez the choice as to whether he wanted to leave the door open. While two officers instead of only one faced Dominguez in this case, Detective Riedell made clear that Officer Hernandez was not investigating his case and was only there to translate.

13

Under these circumstances, we do not find the ratio of officers to the suspect (see *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403) weighed meaningfully in favor of finding the interview custodial.

Dominguez argues no reasonable person would have felt at liberty to walk past two armed police officers to leave the room. However, it is safe to say it is more the norm than the exception for police officers to possess holstered service weapons while on duty, so this would frequently be the case when interviews take place at the police station. The United States Supreme Court has made clear that *Miranda* warnings are not required simply because the questioning takes place at a police station (*Mathiason, supra,* 429 U.S. at p. 495) and it is reasonable to assume they reached this decision despite knowing a suspect likely would have to walk past at least some armed officers in order to exercise the right to terminate the interview and leave the station. Had Detective Riedell or Officer Hernandez been brandishing their weapons, our analysis may have been different, but they were not.

We also are not persuaded by Dominguez's argument that the interview was accusatory because Detective Riedell falsely told him adult male DNA was found on Doe's breasts and that his wife's pay stubs showed she was working that night. Detective Riedell did not tell him *his* DNA was found, although that was the implication, only male DNA. Regardless, the false claim was no different than the claim by the officer in *Mathiason* that the defendant's fingerprints were found at the scene, and the high court nonetheless found that interview noncustodial. (*Mathiason, supra,* 429 U.S. at p. 493.)

While it may be true that " '[a]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is

14

not free to leave' than would general and neutral investigative questions . . . on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) Here, as in both *Mathiason* and *Beheler*, the interview was short, lasting only 45 minutes with a 10-minute break,[3] and Dominguez willingly spoke with the officers about his actions on the night in question. Instead of aggressively questioning Dominguez, Detective Riedell asked for his side of the story and remained calm. Even when she challenged him with real and fake adverse evidence— the statements about the male DNA, his wife's pay stubs, and the Facebook post—it does not appear it was done in a threatening manner, that she rejected his answers, or that she persisted in asking the same questions until she received a different answer. "[P]olice expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*People v. Moore* (2011) 51 Cal.4th 386, 402.) In fact, even when Dominguez admitted to rubbing VapoRub on Doe's neck, Detective Riedell did not pressure him to confess that he also massaged her breasts or tried to reach into her pants, nor did she otherwise convey the message that he could not leave until she obtained the answers she sought.

We disagree with Dominguez that this case is analogous to our prior decision in *People v. Saldana* (2018) 19 Cal.App.5th 432. Although Saldana voluntarily went to the police station for questioning and was told he could

---

[3]    We also note it appears likely Detective Riedell covered the same amount, if not less, ground during that time given that every question and answer had to be translated by Officer Hernandez.

15

leave (*id.* at p. 436), the relevant similarities end there. What we found critical in *Saldana* were the detective's intense, confrontational, and relentless interrogation techniques. Even though Saldana denied the detective's allegations more than 25 times (*id.* at p. 437), the detective repeatedly rejected his denials and would not take no for an answer. (*Id.* at pp. 457–458.) He presented "an unwinnable dilemma" wherein he "persisted in telling Saldana he should identify himself as either a pedophile . . . or an opportunistic molester." (*Id.* at p. 459.) "Insisting on the 'truth' until Saldana told him what he sought, the objective message conveyed was that Saldana would be interrogated until he admitted touching the girls." (*Id.* at p. 460.) Under these circumstances, we found the interrogation custodial because "a reasonable person in Saldana's position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave." (*Id.* at p. 458.) That simply was not the case here.

Having considered the totality of the objective circumstances, we conclude a reasonable person in Dominguez's situation would have felt he was free to terminate the interrogation and leave. (*Howes*, *supra*, 565 U.S. at p. 509.) Therefore, he was not in custody for *Miranda* purposes. Because we conclude Detective Riedell was not required to provide a *Miranda* warning under these circumstances, the trial court did not err in denying Dominguez's motion to suppress the statements he made prior to the *Miranda* advisement she later offered.

As to the statements he made thereafter, Dominguez does not argue his waiver of his *Miranda* rights was not knowing and voluntary. His only argument is that the earlier statements should have been suppressed and that, having already made admissions, any reasonable person would have

16

believed that attempting to invoke their rights after the advisement would be futile. We need not address this argument because, having determined the trial court need not have suppressed the earlier statements, there are no grounds for blocking admission of the post-*Miranda* statements. (C.f. *Missouri v. Seibert* (2004) 542 U.S. 600, 617 [finding postwarning statements inadmissible where prewarning statements *were* suppressed and the facts did not "reasonably support a conclusion that the warnings given could have served their purpose"].)

## II.

### Sufficiency of the Evidence Supporting the Convictions on Counts 1 and 2

Dominguez contends substantial evidence does not support the jury's finding that he had the intent necessary to support his convictions. We disagree.

A. *Legal Principles and Standard of Review*

In considering a challenge to the sufficiency of the evidence, "we must 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) We do not substitute our own factual determinations for the factfinder's (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078) as " '[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*).)

"The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on

17

circumstantial evidence.  [Citation.]  Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

B.  *Analysis*

The jury convicted Dominguez under section 288, subdivision (a), which provides that "a person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony."  (§ 288, subd. (a).)  "[C]ourts have long indicated that section 288 prohibits *all* forms of sexually motivated contact with an underage child.  Indeed, the 'gist' of the offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act.  [Citation.]  '[T]he purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. . . .  If [the] intent of the act, *although it may have the outward appearance of innocence,* is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' " (*People v. Martinez* (1995) 11 Cal.4th 434, 444 (*Martinez*).)

18

"Because intent for purposes of . . . section 288 can seldom be proven by direct evidence, it may be inferred from the circumstances." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 440.) "In determining whether the defendant acted with the required specific intent, the jury therefore looks to all the circumstances, including the charged act. [Citation.] 'Other relevant factors can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or to avoid detection [citation].' " (*People v. Villagran* (2016) 5 Cal.App.5th 880, 891 quoting *Martinez*, at p. 445.)

Dominguez contends the evidence in this case shows that he wanted to help Doe because she was sick, not that his conduct was in any way sexually motivated. He highlights that Doe admitted she was "really sick," that he did not attempt to kiss her or say anything sexual, that her mother did not notice a change in Doe's behavior for almost a year, that Doe continued to visit K., and that VapoRub is commonly used to treat cold and flu symptoms in Dominguez's country of origin, Mexico. Although Doe claimed he bought her candy and offered to take her and K. out when she visited after the incident, he points out that there is no evidence he ever tried to get her alone. Finally, he argues Doe's admittedly bad memory may have affected her ability to accurately recall the events of the sleepover.

While it is true some of the evidence was favorable to Dominguez, credible evidence also supported the conclusion that he had the requisite intent. On substantial evidence review, we do not independently determine the facts, but rather examine the record as a whole in the light most favorable to the judgment. (*Brown*, *supra*, 59 Cal.4th at p. 105.) "The final determination as to the weight of the evidence is for the jury to make. We do

19

not reweigh it and substitute our view for theirs." (*Id.* at p. 106.) In other words, while Dominguez's argument that he may not have used the best judgment, but did not have sexual intent, may be another reasonable interpretation, we may not reverse the judgment if the jury's interpretation also was supported by substantial evidence.

That is the case here. The evidence showed Dominguez frequently contacted Doe and invited her over even though K. had her own mobile phone and Facebook account. On the night in question, Doe testified that Dominguez separately massaged each of her bare breasts. He then pulled her over to his bed, rubbed her stomach, and moved his hand toward her private parts. When she told him to stop, he told her not to tell anyone. Evidence that he not only touched, but massaged her breasts, and tried to touch her private parts certainly suggests a sexual intent and, " 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' "[4] (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118.) The fact that he then told her not to tell anyone supports a reasonable inference that he wanted to hide his explicit intent and lewd act. On substantial evidence review, we " ' "must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]" ' " (*People v. Salazar* (2016) 63 Cal.4th 214, 242.) Reversal is warranted only if "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) On these facts, we conclude the judgment was supported by sufficient evidence.

III.

---

4      Furthermore, Doe clarified that she only had a "bad memory" for dates, not events.

Denial of Probation

Dominguez's final contention is that the trial court abused its discretion in denying him probation.

A.  *Additional Facts*

At the sentencing hearing, the prosecution requested that the court sentence Dominguez to the middle term of six years on count 1 and one-third the middle term on count 2, run consecutively.  Counsel for Dominguez asked the trial court to grant probation relying on the psychological assessment provided by John Kinsman, Psy.D., who opined that probation was appropriate.  Counsel also argued that Dominguez had numerous other opportunities both before and after the sleepover to do more to Doe and the fact that he never did demonstrates that the incident was an anomaly.  Both sides agreed his lack of a criminal record was a mitigating factor.

The trial court concluded probation was not appropriate for the following reasons:  (1) Dr. Kinsman said Dominguez appeared to lack empathy toward the victim, changed his story, and adamantly denied the charges; (2) the victim was vulnerable, given her age and relationship with the family; (3) Dominguez inflicted emotional injury, as reflected in the victim's impact statement; and (4) Dominguez took advantage of a position of trust with a victim who viewed his family as a second family.  The court determined the low term would be contrary to the interests of justice but gave some weight to his lack of a criminal history.  It imposed the middle term on count 1, but ran the sentence on count 2 concurrently, and entered a criminal protective order.

B.  *Legal Principles and Standard of Review*

"[A] grant of probation is an act of grace or clemency, and an offender has no right or privilege to be granted such release.  [Citation.]  Stated

differently, '[p]robation is not a right, but a privilege.' " (*People v. Moran* (2016) 1 Cal.5th 398, 402.) "[I]n most circumstances the trial court has broad discretion to choose probation when sentencing a criminal offender. A reviewing court will defer to such choice absent a manifest abuse of that discretion." (*Ibid.*)

The court must determine in all cases whether the defendant is eligible for probation. (Cal. Rules of Court, rule 4.413, subd. (a).) Where, as here, the defendant is not categorically ineligible for probation under section 1203.066, subdivision (a), the trial court must evaluate the criteria affecting the decision to grant or deny probation set forth in California Rules of Court, rule 4.414. These include:

"**(a) Facts relating to the crime**

"Facts relating to the crime include:

"(1) The nature, seriousness, and circumstances of the crime as compared to other instances of the same crime;

"(2) Whether the defendant was armed with or used a weapon;

"(3) The vulnerability of the victim;

"(4) Whether the defendant inflicted physical or emotional injury;

"(5) The degree of monetary loss to the victim;

"(6) Whether the defendant was an active or a passive participant;

"(7) Whether the crime was committed because of an unusual circumstance, such as great provocation, which is unlikely to recur;

22

"(8)  Whether the manner in which the crime was carried out demonstrated criminal sophistication or professionalism on the part of the defendant; and

"(9)  Whether the defendant took advantage of a position of trust or confidence to commit the crime.

"**(b)  Facts relating to the defendant**

"Facts relating to the defendant include:

"(1)  Prior record of criminal conduct, whether as an adult or a juvenile, including the recency and frequency of prior crimes; and whether the prior record indicates a pattern of regular or increasingly serious criminal conduct;

"(2)  Prior performance and present status on probation, mandatory supervision, postrelease community supervision, or parole;

"(3)  Willingness to comply with the terms of probation;

"(4)  Ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of alcohol or other substance abuse, family background and ties, employment and military service history, and other relevant factors;

"(5)  The likely effect of imprisonment on the defendant and his or her dependents;

"(6)  The adverse collateral consequences on the defendant's life resulting from the felony conviction;

"(7)  Whether the defendant is remorseful; and

"(8)  The likelihood that if not imprisoned the defendant will be a danger to others.

"**(c)  Suitability for probation**

"In determining the suitability of the defendant for probation, the court may consider factors in aggravation

23

> and mitigation, whether or not the factors have been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial."

(Cal. Rules of Court, rule 4.414.)  The court may also consider the opinion of a " 'reputable psychiatrist' " or " 'reputable psychologist' " as to " 'the mental condition' " of the defendant pursuant to section 288.1, but is only required to do so if the court is inclined to grant probation.  (*People v. Thompson* (1989) 214 Cal.App.3d 1547, 1549; § 288.1 ["Any person convicted of committing any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years shall not have his or her sentence suspended until the court obtains a report from a reputable psychiatrist, from a reputable psychologist who meets the standards set forth in Section 1027, as to the mental condition of that person."].)

Additionally, section 1203.066, subdivision (d)(1), requires that the following terms and conditions, as relevant here, be met before probation may be granted to a defendant convicted of violating section 288:

> "(B)  The court finds that rehabilitation of the defendant is feasible and that the defendant is amenable to undergoing treatment, and the defendant is placed in a recognized treatment program designed to deal with child molestation immediately after the grant of probation or the suspension of execution or imposition of sentence.

> "[¶] . . . [¶]

> "(D)  If the defendant is not a member of the victim's household, the court shall prohibit the defendant from being placed or residing within one-half mile of the child victim's residence for the duration of the probation term unless the court, on the record, states its reasons for finding that this residency restriction would not serve the best interests of the victim.

"(E) The court finds that there is no threat of physical harm to the victim if probation is granted."

(§ 1203.066, subd. (d)(1).) The section 288.1 report upon which the court relies must include consideration of the factors specified in subparagraphs (A), (B), and (C) of paragraph (1). (§ 1203.066, subd. (d)(3).)

C. *Analysis*

As an initial matter, this is not a case where the trial court failed to adequately explain its reasons for denying probation and we are left to infer its rationale from the context. Rather, the trial court expressly confirmed that it had reviewed all the materials submitted and then explained its reasoning at length. It specifically considered and provided sound reasons for rejecting many of the same arguments Dominguez makes on appeal: that Dr. Kinsman recommended probation; that this incident was an anomaly; that he applied the VapoRub based on his culture and his desire to help; and that he had no prior criminal history.

Although Dominguez reiterates these arguments here, he does not explain why the trial court's determination was arbitrary and capricious. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 89 [explaining the appellant bears the "heavy burden" of demonstrating that the probation denial was arbitrary, capricious, or exceeded the bounds of reason].) Instead, he focuses on this incident being an anomaly within the multitude of times Doe visited the home. But, given that the evidence in the record shows the sleepover was the only opportunity he had to interact with Doe alone, that factor could just as easily weigh against a grant of probation.

Likewise, we are not persuaded by his contention that vulnerability, which often is associated with age, should not be considered because age was also an element of the offense. Here, the court also cited Doe's relationship with the family as underlying her vulnerability in addition to referencing her

25

age. This was reasonable given that K. was her best friend, she often relied on the family for food, and she felt so close to them she wanted to be adopted.

There is no doubt some factors under rule 4.414 weighed in favor of probation. "However, even if there were several mitigating factors that might weigh in favor of probation, this does not necessarily mean that the trial court abused its discretion in deciding against granting probation." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1530–1531.) The remainder of the factors upon which the trial court relied were criteria listed as relevant under the California Rules of Court, rule 4.414 and were reasonable grounds for finding him unsuitable for probation. Ultimately, what Dominguez asks us to do is reweigh the factors relating to the decision to grant or deny probation. That is not our role. (See *People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 825 ["In reviewing [the determination to grant or deny probation,] it is not our function to substitute our judgment for that of the trial court"].) On the record before us, we cannot say the trial court's denial of probation was arbitrary, capricious, or in excess of the bounds of reason.

## DISPOSITION

The judgment is affirmed.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DATO, J.